And we'll hear our argument next in number 19, 4332, United States v. Patterson. Mr. Lightenberg. May it please the Court. My name is Jim Lightenberg, and I'm the Minister of the United States Attorney in the Southern District of New York. I represent the United States in the 4th Amendment. The 4th Amendment does not require police officers to risk their lives in stopping armed and dangerous suspects. It does not force officers to choose between protecting themselves and preventing evidence from being suppressed and criminals from walking free. This Court has repeatedly emphasized that it will not impose such a house of choice on law enforcement officers, and this Court has never required officers to put themselves in harm's way during a carry stop when they reasonably suspect that the individuals they are stopping are armed and dangerous. Instead, this Court and other courts have repeatedly approved the use of reasonable precautionary measures when they are justified under the circumstances. In this case, the officers acted reasonably. They were in a dangerous situation. They were approaching a car that they reasonably suspected contained armed men, which is a threat to civilians with a gun. As Judge Lightenberg found, at this point in the encounter, they could not see inside the car, so they had no way of knowing whether the armed suspects were currently pointing a gun back at them. The suspects, you're not saying there was any more than a reasonable suspicion that this car contained the people who had engaged in the menacing, are you? Correct. And as you yourself say, that's a low bar. So they had no way of knowing that the people in the car were anything other than a mother and a child in a car seat, right? Well, they had reasonable suspicion. Had a reasonable suspicion, a low bar. It was reasonable for them to stop and inquire. Now, we've had a lot of cases of this sort in which the police officers approach the car with guns drawn but not pointed. Does that say anything about what normal police procedure might be in these circumstances or what is considered by most police officers that we've encountered to be a reasonable way of approaching a car when you have that kind of suspicion? Two points, Your Honor. First, in a lot of those cases, I think most of those cases, the reason to think that the suspects were armed and dangerous was lower than here. A lot of those were drug cases where there was no other indication they were armed. And then second, I want to point to a case that... But the government argued in all of those cases that there was a reasonable suspicion that the people were armed, right? No question, Your Honor. My point is here there was even more... Well, even more means that these were people who were driving a car similar to a rather broad description of what kind of car it was that the people who did the menacing and had the gun were in, right? I respectfully disagree, Your Honor. This was a very specific description. A black or gray Camaro or Challenger. If it had been a Mustang or a Thunderbird, they wouldn't have had reasonable suspicion? Well, I'm not sure, Your Honor, because those facts aren't on the record. But the officers here testified that they don't see many Challenger Camaros. And the government put in statistics showing that about one in a thousand cars registered in Westchester County are black. Adding up to some 800 cars, put another way, right? Yes. So that was actually a very specific description. And just to return to your question... Well, I mean, see, what concerns me, I take all of your points and I appreciate and I'll be asking your adversary about some of these points. But don't we have to look at this from the vantage of... The question is what adds up to an arrest? What kind of behavior by the police is so intrusive to ordinary citizens that it should require probable cause before it happens? And I'm looking at this from the vantage point of people in the car who we have no reason at the time that the officers stopped the car other than that it's the same kind of car that was at issue, granted, nearby, in an incident not long before. It could have been anybody. And at that point, before they see furtive movements in the car, before they're able to identify that the men in the car are at least black, and they are men, which is about the only description of the perpetrators that they had, before they know any of that, they're approaching with an automatic weapon pointed at the car. You say, in talking about what a serious crime the suspects had committed, that this was very serious behavior. How is it distinguishable from what the police did here? In other words, from the vantage point of the people in the car, I assume those people would be terrified, particularly if they were not the perpetrators. Isn't that right? Well, with respect to the honor, you know... Does it matter? Would they be terrified? And does it matter that ordinary citizens apprehended in this way, reasonably stopped and subject to inquiry by the police, would be terrified by what the police were doing? Does that have any bearing on whether this is an arrest or not? Your Honor, I believe we have to look at this from the perspective, as many courts have said, of a reasonable officer on the scene, knowing what they knew at the time. And under these circumstances, it was reasonable for the officers to do what they did under the circumstances. They couldn't see inside the car, and they didn't know if people were pointing a gun back at them. And I understand that sometimes it's possible that innocent people would be stopped, but as the Supreme Court said in the Illinois board vote, Terry stops the risk that officers may stop innocent people. And that's why a Terry stop has to be reasonable. But a Terry stop still has to be distinguished from an arrest. Right, Your Honor. But as the court said in Merritt, which was cited in our brief, the question is not strictly was this an arrest or was the level of force an arrest. The question really, at the end of the day, as in any court amendment case, is whether what the police officers did here was reasonable. And it was reasonable given the information that they had at the time and given what they knew. It was also reasonable for them. Well, one of the defendant's arguments is that the menacing had been completed. These men were going about their business. It's only a misdemeanor. So what about it is so dangerous at the point that they came out and stopped them and approached with their guns drawn that required that level of precaution? Well, first of all, before the stop, the officers were told on the dispatch that these men were still looking for one of the victims. So the menacing and the criminal behavior here had not yet been completed. Of course, at the time of the stop, there's no indication that the victim was around, but the officers themselves and the many innocent bystanders in the area, they were obviously at risk. I thought your point was, if I read your brief correctly, that the crime being investigated was one in which a weapon had been drawn on a human being. Am I right? It would, yes, Your Honor. And so I thought your argument was that, therefore, officers, if they had reasonable suspicion here, had reasonable suspicion that they were investigating people who did not hesitate to draw a weapon. Exactly. Not simply to be armed with a weapon, but to draw it. And is that the government's view? Exactly, Your Honor. And that having menaced one person at gunpoint, they had made clear that they were looking for another, that she was not their primary target. They were still looking for the other. That's exactly right, Your Honor. And menacing, as you know, requires displaying the weapon with intent to cause physical injury, serious physical injury, or death. So things like that. But now we're not talking, the officers are investigating that crime, but then the question is, in investigating that crime, what are reasonable steps to protect themselves? Correct. And your view is that it wouldn't have been enough for them to draw their weapon, they had to point it. That's correct, Your Honor, and that's for a few reasons. Yes, I was going to ask you to articulate that. Yes. So first of all, as I noted, they couldn't see inside the car at the time, so for all they knew, the people were pointing back. Obviously, a gun at your side, it takes time to move the gun from at your side to a pointing position, so that would put them at a disadvantage to the armed suspects if they were going to be shot at. It's also the case that pointing the guns could prevent the incident from escalating by a show of force. As the court held last week in Weber, the risk of harm to both the police and the suspects is minimized if the officers exercise unquestioned command of the situation. The case law also supports pointing. I was going to mention Garcia, which is a case that, frankly, we should have spent more time on in the brief, but in Garcia, if you just use the Second Circuit opinion, you wouldn't get all the facts, but if you look at the district court opinion, and you look at the briefs, including the government's briefs, it's clear that in Garcia, where the only indication that someone was armed was that there was drug trafficking, and then the suspect was not, in fact, armed, this court approved a ferry stop involving 10 to 13 officers in vehicles. One car went behind the suspect's car, nine or ten cars drove in front and blocked it, and four or five officers pointed guns, pointed the guns. And so there is precedent, clear precedent, for officers to point guns when it's justified under the circumstances, not in all cases. Finally, there's evidence that the officers acted reasonably here. When Mr. Patterson fled, and when they thought they saw a gun in the sand, no one fired a shot, no one acted aggressively, they used nonlethal force, they tried to fire a taser, and they missed. So no one was acting overly aggressively. And then finally, even if there were an alternative, and even if my friend on the other side is able to come up here more than two years after he filed, after Mr. Patterson filed a suppression motion and identified an alternative, that doesn't resolve the issue. As the Supreme Court held in Sharpe, and as this Court held in Paseku, the question is not merely whether there's an alternative, the question is whether a police acted unreasonably and failed to recognize that alternative. So in Paseku, the courts held that although Raguso, the officer, might have chosen to proceed without using handcuffs, the court concluded that he did not act unreasonably in doing so. So even if there's an alternative here, if officers did not act unreasonably in failing to pursue that alternative, I see my time has expired. Thank you, Counselor. You're reserved three minutes for rebuttal. Mr. Lee? Good morning, Your Honor. This is the Court of Appeals. I'm Lee, Federal Defendant for Justin Patterson. District Judge Seibel, an experienced jurist, former head of the U.S. Attorney's Office in White Plains, got it exactly right. The officers just overdid it. They used disproportionate force, excessive potentially judgmental force, to disclose the various information that the carpentry suspect in it completed to seize Mr. Patterson, using force that was tantamount to harassment. And, Your Honor, it's exactly right. The huge difference between drawing a gun, unclosing a gun, just drawing a gun, and aiming a gun, especially, you know, this is an M-16 assault rifle case, right? It's a civilian version of an assault rifle. Somebody's pointing a gun at me like that. I'm under arrest. This is not a terrorist act. This is not a dangerous intrusion on my Fourth Amendment liberty. This is a full-on arrest of a crime. Mr. Lee, you heard the government respond to one of my questions by saying that one of the critical points supporting their argument is that the crime under investigation was one where the suspects had just drawn a gun on a victim. And so I'm assuming that what we're being urged to infer is that when you're dealing with someone who did not hesitate to draw a gun, that police officers would have to be ready to respond to someone who was prepared to draw and fire a gun. Why doesn't that indicate that the pointing of the gun was not excessive here? Help me out. So I have three responses to that. First, the menacing, if I could correct something here. The menacing is the display... The decorum of an offense is to be scared, right? That's why it's illicit. It's not to injure someone. It's not even trying to injure someone. The whole point is it's displaying an emphasis... Well, we weren't dealing with officers who were thinking, what are the elements of menacing? They were thinking of what the woman had told them had just happened to her. Well, if I could... So I don't think the government disagrees with us at this point that what the 911 caller said is not part of the original suspicion or probable cause analysis under the Collective Knowledge Operator. Because under this case, this court's case in Cologne, unless the government proves that the 911 operator is a trained law enforcement officer, what the 911 caller said to the operator is not part of the analysis unless the police officer is on the scene of a mentally ill person. And so all that the officers know is what the dispatcher said, which is menacing to the handling. That's it. We don't know the specifics of it, whether it was really, like, drunk, you know, between this kind of... Do you dispute that it was reasonable for the officers to believe that the suspects were armed and dangerous? Well... That's a yes or no. Your Honor, it's a hard question to answer yes or no because it's such gradations, right? And it's not just the gradations that I'm drawing. The law enforcement's gradations. Well, let's start with armed. Okay, armed. Well, you know, our view is that... It's a harder question, and our view is that there's not even a reasonable suspicion that just, you know, a dark-colored muscle car on a busy road is not enough. So that's part of it. But even if you think there's a reasonable suspicion it's not part of it. And yes, based on... If you want to go there, yes, armed. But armed does not necessarily mean so dangerous that you need to stop this person in the street... But, Mr. Lee, it was... What was... What was relayed to the officers was menacing with a firearm. Now, I have a... Okay, I recognize that doesn't say whether the gun was held to someone's head or waved around or displayed. But in any event, there is no question that what the officers were investigating was someone who threatened someone, tried to scare them by the display of a firearm. Right? I mean, that's... That can't be disputed. That's the report. And if the court thinks there's a reasonable suspicion based solely on the color and the general type of car, then yes, there's some basis that there is reasonably that there is a firearm. But again... Does it matter at all that they're approaching a car? I mean, again, when you generalize this, you know, one of the hypotheticals I tried out in my head thinking about this is suppose there were something similar but it happened with someone walking down the sidewalk that the person walking down the sidewalk met the description a rather generalized description that could apply to a number of people of someone who had menaced someone with a firearm. And then I think it would be kind of strange to say the police can't approach that person safely without pointing an automatic weapon at him. On the other hand, in that circumstance, they presumably see the person in open view. They can see where his hands are. They can see what he's doing. Whereas in a darkened car, the approach is more unknown as to what the officer might confront. Sure. So there is a difference, and it's a totality of circumstances. You know, they treat police cars... They treat police cars... It's not a remote, dark road in the middle of the desert. They're at a gas station. It's a very well lit gas station. Okay? And how do you think that helped you? Because I thought the government's view was that there were people around and this was actually a situation where not only the officers but members of the public might be engaged. It helps me in the sense that this is not some sort of exegesis, right? There's not an emergency here. This is not a typical car stop in that way. And again, before I forget, this court's decision in Lieber last week in the Alhambra, that was a car stop, right? And in fact, part of the decision... Alright, but it's a car stop for people who are thought to have just been involved in menacing someone at gunpoint. Now, are you suggesting that the officers shouldn't have displayed weapons at all or had weapons drawn at all? That it was unreasonable to even have their weapons drawn in those circumstances? I'm sorry, Eddie. Well, let's stick with reasonable suspicion for a moment. Alright, but for a moment because the government, I think, says that they're arguing terrorists. They're not trying to argue that they had probable cause. So, if they had reasonable suspicion to stop these folks, I'm trying to gather from you whether you think the display of firearms was excessive regardless of whether they were pointed or not. In most courts' cases, that would include Lever, the suspect is believed to be armed, that police officers could stop a car, order the suspects to get out then, and perhaps unholster, maybe one or two could unholster their firearms and ask them to be... So, are you asking us to draw a line that would say, have your firearm ready, drawn, is okay, pointed, is excessive, and requires probable cause? Is that a line you're asking us to draw here? It's a totality of circumstances, Your Honor. And I would say that in this particular circumstance of a complete misdemeanor, and let me correct a misperception of the record here. The suspect was complete. What the dispatcher said was that they may be looking for someone named Brandon Silver at the Lexington Avenue address. They were going... I don't know why you say the crime was completed. They were looking for someone, and I mean, you know, not to give them a prize or anything. They were willing to threaten the target's mother at gunpoint, and now they were looking for the target. Why do you say this is a complete crime? Any objective observer being told that there was an incident at some point in the past and that the suspects were looking for somebody named Brandon Silver at the Lexington Avenue address, and that somewhere between 10 and 14 minutes later, the encounter car going the other direction, away from Lexington Avenue, and behaving entirely lawfully, right? Following this car toward the mile. No evasion, not even a violation of traffic. Okay. Yes, under those circumstances, no reasonable person would think that this is an ongoing or imminent offense. This is a complete misdemeanor, and using, and again, it's just, I'm going to ask you to draw a line for all cases that, you know, there are situations where the police are investigating an ongoing, imminent crime, a serious, serious, violent crime. Yes, aiming a gun may be reasonable under those circumstances, but not here. So you think that that means that the officers have less reason to be concerned about their own safety? You know, what the Supreme Court said to Hensley is this. Hensley found that it's the case that extended a Terry stop. There's a question with Aperture whether you can do a Terry stop for a completed felony. And Hensley said, yeah, you can do it for a completed felony. And in fact, it's still an open question whether you can do a Terry stop for a completed misdemeanor. It's still an open question. We don't argue that there's some sort of, you know, we're saying it's part of the analysis, part of the totality of circumstances. So all I'm saying is that the totality of circumstances the fact that it's a misdemeanor, the fact that it's completed, the fact that the suspects were behaving entirely lawfully going away from where the crime occurred and where the victim was and where the other person they were looking for was. And under those circumstances, what Hensley said is police officers have a wide range of opportunity to choose the circumstances and the time of the stop. The government keeps saying that we haven't said what other alternatives there are. Of course we wouldn't have said that. Our view is that there was no reasonable suspicion so they couldn't have seized him in any way. I'm sorry, I missed that last phrase. Our view is that there's no reasonable suspicion so they couldn't have seized him. But of course they couldn't continue their investigation. If they just, let's say, they sped up a little and seized two black males, well, maybe that would be reasonable suspicion. Maybe they could have asked the victim did the car have South Carolina plates? This is a very distinct fact about this car. It has a South Carolina plate. Why didn't they ask the victim about it? They could have done a number of things. They didn't do any of those. What about after the point in the gas station they had stopped the car, the Camaro? What about there? At that point, what precaution would you advise? If there was a reasonable suspicion, let's say they did have a reasonable suspicion for a terrorist act, they could have done what they did in the meantime. They could have ordered them to get out of the car, maybe step out of the car, maybe with a gun and holster. But the idea of aiming guns at somebody is concluding that they're the suspect. Well, at that point, we had a couple of added facts, right? I mean, it took them a while. The passengers did not get out of the car immediately. When they tried to handcuff your client, he fled. No, but the assault rifle came out of the vehicle. No, no, I know that. I know that. But in terms of what happened thereafter, it was an evolving situation. Yes, yes. Probably as frightening as they're pointing the gun at the victim. A slip of the finger means somebody's dead. Mr. Lee, could you address Mr. Leidenberg's point about Garcia, that the facts of Garcia actually did have the officers immediately, in the executing the stop, pointed weapons, whether or not this Court relied on that or not? In every case that this is discussed at government sites, it's the investigation of an ongoing crime, or an imminent crime, or involved a hot pursuit. I don't know that case specifically, but I don't see any of the cases in which there were three guns, including an assault rifle pointed at the defendant. The only case that the government sites involving an assault rifle pointed at the defendant that somehow was a terrorist cop was an unpublished decision. There was no published circuit-level case that would uphold such actions as a terrorist cop. And it was because police were investigating a murder. So, you know, these things matter. And again, I understand, it's very easy to say, to label, arguably, well, you know, the law draws predation in terms of armed and innocent. This is a menace. This is not an assault. This is not an attempted robbery. This is not a murder. And this is something of a first-degree murder. See, I'm having trouble with that argument, Mr. Lee, and I want to give you an opportunity to assuage my concerns. They had just pointed a gun at a woman. And they were looking for a suspect, looking for a target. So why do you think that this is not a serious armed and dangerous? You know, I'm not saying that the line between misdemeanors and felonies is the dispositive, but it is a distinction that the law recognizes, and the Supreme Court recognizes this time in Lane v. California about, you know, if the police are pursuing someone they suspect of a felony, you can enter the house, right, without a warrant. But Lane says if they're suspecting a misdemeanor, that's not necessarily enough. So all I'm saying is, it's a factor in the analysis. And the fact that I'm not, I don't understand either, though. Why are they investigating a misdemeanor? They're investigating an allegation that someone was threatened or menaced with a gun. Now, as you say, we don't know whether that dispatcher was a trained law enforcement person, let alone a lawyer who was using the word menacing by saying, you know, we're investigating a violation of section whatever that these people are thought to have committed. There are facts that are, or alleged facts, that are reported by the dispatcher. And those allegations are that two men threatened a woman with a firearm, menaced a woman with a firearm. I don't know why they aren't entitled to, the officers aren't entitled to take that in the English meaning of those words rather than checking in the statute book to see what menacing means as a violation of New York law and whether it's a misdemeanor or a felony. I'm saying it's part of the analysis. There is a difference to the law between menacing, assault, and robbery, and attempted murder. And the choices that are menacing does have relevance. It's not dispositive. I'm not saying it's all dispositive. Well, the problem is, of course, with any totality of the circumstances is there's always any given fact that counts could be the dispositive one that tips the balance. And here, I mean, the thing that I find problematic for both sides is the fact that seems critical to me, that isn't determined already by authoritative case law, is pointing guns and particularly pointing automatic weapons, assault rifles, at a suspect based on what is, at best, a reasonable suspicion of what I would count as a rather serious, rather dangerous seeming offense. No, we know how long ago. It was like ten minutes. We're not talking about sometime in the past. Oh, by the way, we heard that people did this once upon a time. But what the call said was that he had menaced the victims in a shop right parking lot and the Camaro was believed to be headed to the victim's home. All of that indicates a reasonable indifference that we're dealing with something that happened recently, not recently. It happened very close to where they find the car, right? They know the location is not far away. And it certainly sounds to me, from even what you just quoted, that this sounds like something that didn't take place two weeks ago. It didn't take place a day ago. It's more or less an ongoing all points, look out for this car because they're going around doing this. He still completed the shop. The suspects were not But I don't even get why that matters so much. What you're talking about is the officers undertake a certain level of force. The argument is that's a level of force that was reasonable to protect themselves and other people under these circumstances. So, I mean, the fact that the crime they're investigating is over. Let's say we give you, I'm inclined to give you that. But still, what they're told is they're looking for a guy. If these are the people, which is what they suspect. In fact, I'm not sure that we know that they're the people, actually, right? There's no finding that these are the guys who did it. They were never convicted of doing that, right? What they suspect is that these are the people who did that not long before that they have a gun that, as Judge Radjic is pointing out, they were prepared to display. And the question is, and I find it very difficult as a judge to second-guess well, what's safe and what's not safe, other than the fact that there are so many cases that seem similar where officers take the precaution of unholstering their weapon as they proceed so that they can respond quickly to an emergency. Now that's a thin line to draw, but at some point the salami has to stop getting sliced and you have to say, this is getting to be too much or this is not getting to be too much. So if I could respond to the completed point I do think that it does matter for dangerousness, and this is what Hensley points out you know, when suspects assume that they committed this crime but then, you know, they've done what they're doing and they're going somewhere else. And what are the odds that they're going to shoot a cop over this? You know, that's kind of the question. Anything can happen it's beyond speculation, and the circumstances. And the other, the critical aspect of the fact that it's completed is that so the other component is that the officers are supposed to take the least intrusive means that are reasonably available that are reasonably available to the rest of the staff. Because it's a completed case, they don't have a lot of choice about this, right? They could have done a whole bunch of other stuff they didn't do anything, they just immediately jumped the gun and displayed maximum force. And then the final piece of the totality of the circumstances respectfully includes the quantum of evidence. Includes the? Includes the quantum of evidence. Thank you. And even if there's just a little bit over the reasonable suspicion line and it will just be barely over given that all we're talking about this is a production car, let's not pretend this is a Lamborghini or something. This is a dark Charger or Challenger. This is not something that is so rare. This is something that we see regularly. I'm not saying they're common. But you see them. There's such a little bit of evidence that should not allow the government to police so much deadly force. Thank you. Thank you, Mr. Lee. Mr. Leidenberg, you've got three minutes for a rebuttal. Thank you. I'll start with the point that the other side just made which is about the quantum of proof the level of reasonable suspicion and age bearing on that path. The bottom line is that you can't create a category of cases where police have reasonable suspicion to conduct a stop and there's danger and they are not allowed to use the level of precautions necessary to do it safe. Otherwise, you essentially create a category. That's at such a high level of generality. I don't know what that even means. You're talking in each case about how much force and how much information and what's going on. That's the government's position usually. It's the government's position here effectively that you have to look at all the facts and evaluate precisely what they did to decide whether it was reasonable. I'll address another point specific to this case that's been raised a few times which is the AR-15 and why that was necessary in this case. First, as Officer DiRienzo testified, at the distance they were at, an AR-15 is more accurate than a handgun. There's reason to think that the AR-15 actually created a safer situation given the presence of innocent bystanders in the area. If the officer was forced to fire a shot, it's better to have a more accurate gun. The AR-15 mitigated the danger in the circumstance. The officer, if the guy gets out of the car with a gun in his hand and points it at the officers, there's only going to be one sniper shot fired from that AR-15 and it's going to be accurate. And that's safe. As opposed to everybody's going to start shooting. And it's an automatic weapon. You're not going to fire one shot out of the automatic weapon. Respect to your honor, an AR-15 is not an automatic weapon. It's a semi-automatic. Semi-automatic. It's one pretty stripper pull. And it's more accurate at that distance. It's also one of the most popular pistol guns in America. It's everywhere. And when you're pulling over cars, it's not unlikely, if they're criminals, that they will have an AR-15. So obviously, police don't want to be as innocent. Yeah, I mean, one of the things you're telling us, in effect, and sadly it's not necessarily untrue, is that any time a police officer stops a car with somebody who he has reasonable cause  or for that matter, any time there's a traffic stop or a traffic violation, the person in the car could well have a gun. And in any number of states these days, they're allowed to have a gun and they're allowed to have it concealed and they're allowed to be carrying it around on the streets. So, I mean, I don't know where this stops, but that's the reality for so many of these cases. And yet, in most of the cases, the officers do not do this, at least the ones that have come before this court. Your Honor, we are not asking for any sort of categorical rule like that. We're not. As you noted, we're not asking for any categorical rule. We're saying that under the specific circumstances of this case, given the report of the menacing with a handgun that had just occurred, that the use of the AR-15 at that distance and in order to be more accurate, that it was reasonable. And as I noted before, they couldn't see inside the car at that point, so somebody could have been looking back at them. And again, we know that these weren't overly aggressive trigger-happy officers, because when Mr. Patterson ran... Could you briefly address Mr. Lee's point about this being a completed misdemeanor offense? They were driving in the other direction, going about their business and therefore presumably not dangerous. Well, as your colleague noted, there's really no indication that this was a completed offense. They were still looking for Bryant Silver, who was the target the whole time. Did the officers know that? I'm trying to refresh my memory of the record as to whether they knew that or they only knew that the Camaro was believed to be headed to the woman's home. Your Honor, they knew that. This is grand jury to the 2A. It's also in the supplemental appendix on page 2. It's the first dispatch, and it says the two suspects are possibly en route to 3469 Lexington. They just put in a handgun, and they're looking for Bryant Silver at that location. I see it immediately. Thank you. Yep. And that's an important point, too. In terms of the reasonable suspicion and the location, I think the other type made a big deal out of how the car at the shop ran somewhere you expected it to be. Well, the officers were told that it was possibly en route to 3469 Lexington. For all the officers who knew, the car was still at the shop right, and once they saw that the car was not at the residence, the shop right was the only remaining place that had any significance. So for that reason, officers here specifically went back to the shop right to look for it, and that's exactly where it was. And that was a reasonable inference that proved true in this part. To answer your question about the completed misdemeanor, even if it was completed and the case law says that it's completely cancelled, there's still— the officers are still allowed to take into account the danger posed to them, the danger posed to innocent bystanders, and although I'm not sure there's a case in this circuit, there are certainly cases in other circuits, including the United States v. Wingo, which the defendant made the same argument in the Tenth Circuit about a completed misdemeanor. The suspect in that case had a gun, he was in a bar, and he just showed it to people and said that he was a gang member. He didn't threaten anyone, he didn't injure anyone, the danger was lower than here. Nevertheless, when the officers found his car, there were three officers, all three pointed guns, they ordered him out of the car, had him lie face down with his legs crossed, they handcuffed him and tacked him down, and the Tenth Circuit found that that was reasonable under the circumstances for a terrorist act. Now, this court doesn't need to go that far, it doesn't need to decide that, it only needs to decide what happened here today. Another Tenth Circuit case openly, somebody called the cops and said he just saw somebody drop a gun on the ground. They just dropped a gun on the ground and then picked it up, put it under their seat, and drove away. There were no threats, nothing like in this case. In that case, the Tenth Circuit upheld the terrorist act with six officers in three police cars, all six officers pointing guns, ordered the suspect out of the car, and handcuffed them. So certainly in other circuits there have been cases involving completed misdemeanors, completed crimes that are less serious than the crimes here, or force greater than the force terrible. It wasn't within the context of the terrorist act. I see my time has expired. I haven't been answering the questions. Thank you both. We'll take the case under advisement.